THE LITTLESTONE COMPANY *et al.*, Plaintiffs-Appellees, *v.* THE COUNTY OF COOK, Defendant-Appellant.

(No. 57892;

First District (5th Division)—April 11, 1974.

Bernard Carey, State's Attorney, of Chicago (Michael H. Saken, Assistant State's Attorney, of counsel), for appellant.

John M. Daley and Jack M. Siegel, both of Chicago, for appellees.

Zachary D. Ford, of Glenview (Frederic O. Floberg, Edward F. Ryan, and William Thomas Braithwaite, of counsel), for intervenor-defendant-appellant Village of Glenview.

Boodell, Sears, Sugrue, Giambalvo & Crowley, of Chicago, for intervenors-defendants-appellants George W. Drymalski and Cecil J. Drymalski.

Ross, Hardies, O'Keefe, Babcock & Parsons, of Chicago, for intervenor-defendant-appellant Village of Northbrook.

Mr. JUSTICE DRUCKER delivered the opinion of the court:

The plaintiffs, Littlestone Company, Julius Ostrom and Estelle H. Ostrom, commenced this suit against defendant, County of Cook, for a declaratory judgment to declare the Cook County zoning ordinance unconstitutional as it applied to their property and as it prevented their proposed special use for a planned development and for other relief as prayed. Julius and Estelle Ostrom were the owners of the subject property and Littlestone Company was the contract purchaser.[1] The County answered the complaint, and after being granted leave to intervene, the Villages of Northbrook and Glenview, Allstate Insurance Company, Paul Walsh, Benjamin Harris, George W. Drymalski and Cecil J. Drymalski also answered. The circuit court after a bench trial declared[2] the zoning

---

[1] Littlestone's obligation to purchase the property was subject to a successful application for rezoning.

[2] The final judgment order, in pertinent part, recites:

"That the highest and best use of the subject property is for the general service planned development of the type and character proposed to be erected by the plaintiffs as hereinabove described.

That the Zoning Ordinance of the County of Cook as applied to the subject property, insofar as it prevents the use of the subject property for a general service planned development, is unreasonable, arbitrary, confiscatory, unconstitutional and void and bears no reasonable relationship to the public health, safety, morals and welfare.

That the proposed use of a general service planned development, providing for three (3) office buildings and a motel with a swimming pool and restaurant facilities, as indicated on the plans submitted to this court, is a reasonable use of the subject property and may be permitted.

That the application of the provisions of the Cook County Zoning Ordinance contained in the R-3, R-4, R-5, R-6 and B-1, B-2 and B-3 Districts would be unreasonable, arbitrary, confiscatory, unconstitutional and void."

ordinance to be unconstitutional as applied to the subject property insofar as it prevented the use of the plaintiffs' property as prayed. The County was enjoined from enforcing its zoning ordinance and directed to issue necessary permits. The County, Villages of Northbrook and Glenview and George and Cecil Drymalski (collectively referred to as defendants) appeal.

Defendants contend: (1) the trial court erred in striking the valuation testimony of the County's real estate appraiser; (2) the plaintiffs failed to sustain their burden of proving that the County acted arbitrarily and unreasonably in refusing to rezone the subject property to permit the plaintiffs' proposed use; and (3) the trial court erred in refusing to permit counsel for the intervenor-defendants to cross-examine plaintiffs' witnesses.

The subject property is a certain tract of land located on the northwest corner of the intersection of Landwehr Road and Willow Road in the unincorporated area of Northfield Township in Cook County. The property is L-shaped and consists of approximately 17.9 acres. It has frontage of 1,144 feet on the north side of Willow Road and frontage of 255 feet on the west side of Landwehr Road. On the corner of the subject property, at the intersection of Willow and Landwehr Roads, is a single-family residence owned by the plaintiffs, Julius and Estelle Ostrom. The remainder of the parcel is vacant.

The subject property lies along the north side of Willow Road and the west side of Landwehr Road, 500 feet east of the Tri-State Tollway. There is one vacant tract of land (Bernstein's property) of approximately 38 acres on the west side of the subject property, which separates the subject property from the Tri-State Tollway. Bernstein's property does not have access to Willow Road.

Immediately to the north of the eastern extremity of the subject property is an 11-acre tract owned by the intervenors Drymalski which is improved with one single-family home. To the immediate north of and touching the western portion of the subject property is the Landwehr Estates development which is a single-family residential development on half-acre lots. To the northwest is a single-family community known as Citation Lake Estates which has been in the process of development for the past 8 or 9 years. To the east and south of the subject property are a number of other single-family developments including the Stonehedge subdivision, located west of Pfingsten Road on Willow, and the Willows East and Willows West single-family developments located southeast of the subject property. There are various single family homes directly east of the subject property on Landwehr Road. To the south of the subject property on the south side of Willow Road there are three

single-family homes. The above described property is either zoned R-3 (minimum lot size of 20,000 square feet) or R-4 (single-family residential with a minimum lot size of 10,000 square feet).

The area to the west of the tollway on both sides of Willow Road has been zoned and developed primarily for office and research purposes. Included in this area is the Allstate Insurance Company and the A. C. Nielson office complex which have been classified for B-3 (General Business) purposes and lie south of Willow Road between Sanders Road on the west and the tollway on the east. Fronting on the north side of Willow Road is the Culligan Water Softener Company on a substantial tract zoned for M-1 (Restricted Manufacturing) purposes and abutting the tollway. North of Culligan is the headquarters of the Illinois Bell Telephone Company on a tract classified for B-4 purposes, also abutting the tollway. East of Sanders Road and adjacent to Illinois Bell Telephone Company are the Coach House Stables zoned for B-5 (General Commercial) and the Sunset View Farm which is a commercial nursery.

Willow Road is a major east-west arterial with a 50 m.p.h. speed limit. It is a four-lane divided facility with a volume of approximately 24,000 cars a day. The intersection of Willow and the Tri-State Tollway has been characterized as a half-clover-leaf: cars going north may exit east and west on Willow, but cars going south have no exits onto Willow, and cars traveling on Willow may enter the tollway going south but cannot enter the tollway going north. Landwehr Road is a north-south two-lane collector road with an average daily volume of 4,000 cars. The intersection of Willow and Landwehr Roads has recently been improved to provide operating channelized left-turn lanes for all four legs, and the intersection is signalized.

The Ostroms have entered into a contract to sell the tract to the Littlestone Company for a total purchase price of $220,000. The Ostroms purchased the subject property in February 1959 from the intervenor-defendants, George and Cecil Drymalski, for $59,000. The subject property is classified in the R-3 single-family zoning district of Cook County in which the minimum lot size is 20,000 square feet.

The plaintiffs propose to improve the subject property with what is designated as a general service planned development, consisting of three five-story office buildings, a six-story motel, and a lake. Each of the office buildings will contain approximately 80,000 square feet. The hotel-motel will contain 201 rooms, parking for 1400 cars, and the lake will be slightly less than 2 acres. The office buildings are 62 feet high and the motel is approximately 59 feet high.

Between the subject property and the single family property to the north there is proposed to be erected a 20-foot berm 5 feet high. On

top of the berm will be a 6-foot-high fence, and along the berm will be planted 6-inch trees. Two entrances will be provided to the development on Willow Road and one entrance on Landwehr Road. There will be lighting in the parking area of approximately 3 foot-candles per acre, which is typical of a shopping area. After 10 P.M. lighting in the parking area will be curtailed and consist only of security lighting.

The plaintiffs applied for a rezoning to B-4 general service district, with a special use for a planned development, to permit the construction of the proposed use as hereinabove described. While office uses are permitted under the B-3 classification, the hotel or motel would be permitted only under the B-4 classification. After public hearings, the Zoning Board of Appeals of the County recommended that the request be denied, and the Board of Commissioners concurred.

The testimony presented at trial was voluminous, and the experts conflicted on a number of points. The following is a summary of the testimony of the various witnesses.

Richard Barancik, an architect and an investor in the proposed development, testified as a witness for plaintiffs as follows: He characterized the natural boundaries of the area as Landwehr Road on the east and Sanders Road on the west. He believed the proposed development is a needed use because of the character of the neighbors to the west, across the tollway. The motel and office buildings will complement each other; the motel will be open all night. The character of the land to the east, north and south is strictly single-family residential. There is single-family building construction going on in Citation Lakes Estates with the value of these homes being approximately $60,000 and up. He admitted that the architectural design of the proposed development is not residential in character. The project would have no adverse effect upon the surrounding single-family residences, and yet he noted that Drymalski's property will depreciate somewhat. The people to the north would see very little of the buildings.

Rolf C. Campbell, a city planning and zoning consultant, testified as a witness for plaintiffs as follows: The Tri-State tollway and its interchange with Willow Road establish the character for the four quadrants, all carrying office research characteristics. The single-family developments to the north, east and south have minimal effect on the character of the subject property, although the trend of development within a 1-mile radius east of the tollway is primarily residential, and most of the building in Citation Lakes Estates has occurred in the last 5 years. He felt the highest and best use of the subject property would be for office research with supporting facilities, i.e., a motel. This would give the school district a substantial base and would give the owners the

highest return on their investment. He believed there is a need for the office buildings and motel although he personally made no studies of this. R-3 and R-4 zoning as not suitable because orderly single-family development is not possible although single-family homes can be physically built on the site. R-5, R-6 and B-1 are suitable uses for the property but are not the highest and best use. A B-2 zoning classification is bad because of access problems; B-3 is logical, but he felt B-4 is the highest and best use since a motel is not allowed under a B-3 classification.

There are many situations where office research is located next to, adjacent or across the street from single-family homes. The proposed project will have no adverse effect on orderly development. There will be some minimal adverse effect on the homes to the north. There will be no effect on properties east of Landwehr Road. There will be a nominal effect on Drymalski's property. Bernstein's property should be rezoned and so should property to the south of Willow Road.

Major arteries like the tollway are not good zoning dividers. They are means that provide the service to a place where you get on and off an interchange. It does not divide properties on either side of them but ties them together as a service facility.

F. Gregory Opelka, a professional appraiser of real property, testified as a witness for plaintiffs: The area is characterized as very dynamic and rapidly growing. The subject property gets its character from uses west of the tollway. The proposed development represents the highest and best use for the subject property due to the general activity of the area, road traffic, noise, an increase in traffic from the tollway, the intersection with its accompanying stop lights and the redevelopment of single-family homes in the area suggesting a need for jobs and shopping. The present classification as well as the intervening classifications are unsuitable for the subject property. The R-3, R-4, R-5 and R-6 classifications are undesirable because of traffic and car pollution, and the B-1 and B-2 classifications are unsuitable. The motel is a complementing use with the modern office facilities.

He valued the property under R-3 as being worth $225,000 under R-4, at approximately $10,000 to $20,000 per acre, and with the development as being worth $40,000 per acre. He valued the homes in Citation Lakes Estates between $75,000 and $125,000 and the homes in Landwehr Estates from $55,000 to $70,000. The project would be compatible with Drymalski's property and Citation Lakes Estates. He found that there would be very little or no effect on any of the single-family homes in the surrounding area. Traffic from the development would not be introduced into the surrounding housing developments. He did admit

that the detrimental effects from traffic would be less under R-4 than under a B-4 classification.

Neil Kennig, a traffic engineer, testified as a witness for plaintiffs: He made an analysis of the traffic impact of the development. The present thoroughfares adjacent to the subject site would be adequate for the traffic that would be generated by the proposed development. He found a more-than-adequate number of gaps for cars turning into and out of the complex. Also, there would be no adverse effect on Willow or Landwehr Roads.

George F. Heck, a water engineer, testified as a witness for plaintiffs: The wells proposed are quite adequate to serve the project's needs. Further, the recommendations he has made to supply water for the sanitary sewer and storm water retention facilities together with the fire-fighting design are adequate and capable of servicing this development.

Cecil Drymalski, an intervenor-defendant, testified as a witness for defendants: With her husband, they originally owned the subject property which they sold to the Ostroms in 1959 for $59,000. She objects to the project because of the noise and traffic which will be introduced into the area. When they bought their property, also in 1959, the tollway was not built, Willow Road was narrower, as was Landwehr Road, and the traffic signals had not been put in.

Leo J. Wilkie, a transportation engineer, testified as a witness for defendants: He also made a study of the traffic impact of the proposed development, including volume and gap counts. He found that Willow Road at the farthest westerly entrance to the subject site has a mountable median, thus allowing left-turn movements out of and into the site, where only right-turn movements are proposed. From this gap study he concluded there would not be enough gaps to accommodate out-going and in-coming traffic. Thus, traffic on Willow Road will be dangerous with backups leading beyond the exits and entrances to the tollway. The effect of insufficient gaps will be to have more cars exit from Landwehr Road, which in turn will hold up Willow Road traffic. He found plaintiffs' experts' traffic estimates and figures to be about 20% low. He noted a similar backup occurrence now exists on Sanders Road, west of the tollway. If the entrances were signalized, a beneficial change could be effected.

Thompson A. Dyke, a city planning consultant, testified as a witness for defendants: The subject property takes its character from the land uses immediately adjacent to it. For the most part these are single-family uses. The trend of development is reflected in the Citation Lakes Estates, Landwehr Estates, Willows East and Willows West and the subdivisions east of the subject property. He found an R-4 classification as the highest

and best use for the subject property and that a subdivision similar to these other subdivisions could be developed on the site.

The proposed development is not suitable for the subject property. It would cut off the residential pattern that has been established in this area bounded by Willow Road, Landwehr Road, the Tri-State Tollway, and Techny Road, on the north. The development would also cut off local street patterns. In terms of intensity of use, the development is drastically different from existing uses which are already adjacent to the subject property. Finally, the development will radically affect the character of the vacant land in the surrounding area, including Bernstein's property.

In a study of the area he found no need for the proposed uses at this location. The tollway forms a natural barrier between land uses; a study of similar half-clover-leaf interchanges shows development patterns with a separation of land uses. He did note that if a full interchange existed, the proposed development would be a sensible use of the subject property.

Ralph Martin, a real estate appraiser, testified as a witness for defendants: He made a study of the value of homes in the surrounding area and found the homes in Landwehr Estates range between $70,000 and $90,000; the homes in Citation Lakes Estates range between $80,000 and $110,000; the homes north of Drymalski's property are approximately $75,000; the homes east of Landwehr Road range between $50,000 and $75,000; and in the Willows developments between $50,000 and $75,000. He also valued Drymalski's property at about $250,000. The value of the subject property under R-3 would be $450,000, under R-4 would be $480,000 and under B-4 would be $690,000.

The subject property is suitable for the purpose for which it is now zoned. It takes its character from the residential developments to the north, east and southeast. Planning indicates continued subdivision development. Landwehr Estates is immediately north of the subject property and could be extended into the subject property. This would be the highest and best use, especially because of the predominance of single-family residences being built in the area, the continuous subdividing of vacant parcels which are east of the tollway, and the demand for single-family homes in the area. The subject property does not take its character from the commercial development to the west.

The proposed development would be detrimental to the surrounding residential use. The depreciation that would result from the development to the surrounding areas would be: 10% to the properties in Landwehr Estates that abut the subject property; 20% to Drymalski's property; as high as 10% to the homes south of Willow Road; as high as 20%

on residences directly east of Landwehr Road; and as high as 10% to homes in Citation Lakes Estates. Some factors that account for this depreciatory effect are the desire of people to live in areas that are strictly residential, the height of the proposed buildings, the intensity of the proposed use, the development not being compatible with residential development, and the office buildings not being screened so that people in these buildings can look down on the surrounding property. He estimated this total depreciatory effect at about $500,000. With this development the character of the surrounding area will be substantially changed.

Although the trend of development has been in the R-3 or R-4 classifications, there are no new homes "fronting," or facing, Willow Road. Willow Road is not an ideal single-family street. He would have the back of the homes face Willow Road.

During direct and cross-examination of Martin it was brought out that he has been in business for 15 years and has an office in Des Plaines just 3 miles west of the subject property. He has made half-a-dozen appraisals within a ½-mile radius of this area, including homes in Citation Lakes Estates. He has actively participated in a sale of property one mile to the west on Willow Road. Furthermore, plaintiffs stipulated as to Martin's qualifications, his familiarity with the subject property and with the surrounding area.

During redirect examination of Martin the following colloquy took place:

"Q: Mr. Martin, have you made any appraisals of property in this area?

A: Yes, I have.

Q: How many?

A: Half-a-dozen appraisals within a half mile radius of this area.

Q: Is it essential to go in every home Mr. Martin before you give a range of the values of the homes?

A: I usually call in the brokers in the Evanston or Northshore area.

MR. DALEY: I move his entire testimony be stricken, as to values be stricken because its hearsay."

The trial court subsequently struck the witness' valuation testimony as hearsay.

Thomas J. Buckley, a city planning and zoning consultant, testified as a witness for defendants: The trend of development is twofold: (a) east of the tollway is entirely single-family within a 1-mile radius, and (b) west of the tollway are large sites and office development character-

ized as mixed residential and commercial. The subject property is located in a very fine residential neighborhood and derives its character principally from the residential areas which abut directly to the north, east and south. The subject property does not take its character from the commercial property to the west which is separated completely by the tollway. A tollway is a proper and adequate buffer or divider for land use.

The highest and best use for the subject property is an R-4 classification due to the topography because the residential street could be extended south into the property, the compatibility with property to the north, the minimal effect on Willow Road traffic and the general trend of development. R-3 is not the highest and best use.

The proposed development is completely incompatible with the existing type of development in the area. The proposed uses are too intensive. It will have a serious detrimental effect on the residential properties. The commercial activity, lighting, intensity of use, excessive traffic generation, physical appearance of the facility and large paved asphalt area would completely disrupt and be out of harmony with the immediately abutting residential properties. The proposed development would change the character of the surrounding property. The surrounding area would have to be developed with commercial or multiple family uses. The different character would also affect the homes to the northeast and southeast of the Landwehr Road, Willow Road intersection. The development would also slow down traffic on a major artery, *i.e.*, Willow Road.

Paul C. Box, a consulting traffic engineer, testified as a witness for plaintiffs in rebuttal: The day before he testified he made a study of the traffic impact of the development. The road network is capable, with proper site improvements, of handling the estimated volume of traffic. He found that at the present time, without any changes, there are sufficient gaps to take care of the right turn exits on Willow Road, but there are inadequate gaps during the evening rush hour across the two-way traffic flow of Willow Road to accommodate the number of cars that would be estimated to exit by left turn at the east access point. He personally made no traffic count. Also, a barrier median is needed for the west exit on to Willow Road, to make it right turn only, but no such plans exist to change the present mountable median.

OPINION

Defendants argue that the trial court erred in striking the valuation testimony of Ralph Martin, defendants' real estate appraiser and sole valuation witness. They contend that Martin's testimony regarding conversations with other brokers referred only to his usual practice and not

what he did in this particular case. Defendants aver that plaintiffs had already stipulated to Martin's qualifications as an expert witness, to his familiarity with the subject property and to his familiarity with the surrounding area. They refer this court to Martin's testimony that he personally made half-a-dozen appraisals in the surrounding area and had actively participated in a sale of property one mile to the west on Willow Road.

Plaintiffs argue that since his testimony was based on hearsay, *Trustees of Schools v. Kirane*, 5 Ill.2d 64, 124 N.E.2d 886, controls, and this testimony was properly excluded.

In *Forest Preserve District v. Harris Trust & Savings Bank*, 108 Ill.App.2d 65, 72-73, 247 N.E.2d 188, the court, when discussing this same issue, enunciated reasoning which we feel controls the instant case. The court stated:

> "We believe that the court erred in excluding the valuation opinions of these witnesses. It seems apparent to us from the extensive recitation of their background and qualifications and of the numerous factors stated by them to have been examined and considered in arriving at their opinions, that these witnesses were rendering an opinion based upon their background and qualifications, upon the physical characteristics of the subject property and surrounding areas, upon the use being made of surrounding properties, upon other factors affecting value, such as availability of utilities and zoning and upon the market in the area for the highest and best use determined by them. We cannot agree that these witnesses sought to give an opinion as to value based solely upon sales of which they had only hearsay knowledge.
>
> * * *
>
> Further, the fact that the witnesses were aware of sales in the area in which they did not participate, and that they based their opinions, in part, on this knowledge, does not render their opinions inadmissible. The trial court stated that it is proper for a witness to render an opinion of value if a witness has hearsay knowledge of other sales as a part of his background knowledge, but that it is improper to render an opinion if a witness has hearsay knowledge upon which he bases his opinion. Under this statement of the law, we conclude that the most that can be said with reference to the testimony of Collins and Fitts is that they may have included in their basis for an evaluation opinion, hearsay knowledge of other sales. The evidence certainly does not indicate that hearsay knowledge was the basis of such opinions.

An expert valuation witness bases his opinion, in part, upon

his knowledge of the market situation in the area in question. To say that his opinion, in part, is not based on this knowledge or information because it merely is a part of his general background and experience, is an exercise of pettifoggery. Even though a witness may have all of the other knowledge essential to his expertise—in that he is well trained and experienced in the factors which are important in arriving at a fair cash market value—he must base his opinion, in part, upon knowledge of the market conditions of the particular area in question. Without the latter knowledge, all of the other knowledge requisite to his expertise would still leave the witness deficient in his worth to a party, to the court, and to the jury."

Furthermore, *Village of Westchester v. Williamson*, 61 Ill.App.2d 25, 35, 208 N.E.2d 879, adequately distinguished *Kirane* when the court stated:

"We believe that Kirane is limited to those cases in which the testimony is based exclusively on information obtained from conversations with others and in which the witness specifically denies any personal knowledge of real estate values in the involved or similarly situated cities. Where, as in the instant case, there is evidence that the witnesses had extensive experience in the valuation of benefits conferred by local improvements or that the witnesses had experience in the value of real estate in other nearby similarly situated villages, their testimony is competent and should be admitted."

It was error for the trial judge to strike Martin's valuation testimony. Since this testimony was already in the record at the time of the court's ruling, we shall proceed with this opinion as if the testimony were properly allowed in as evidence.

Defendants contend that the plaintiffs failed to sustain their burden of proving that the County acted arbitrarily and unreasonably in refusing to rezone the subject property to permit the plaintiffs' proposed use. Defendants further argue that the trial court exceeded its jurisdiction by declaring that the County's zoning classifications (R-3, R-4, R-5, R-6, B-1, B-2 and B-3) would all be unreasonable, arbitrary, confiscatory, unconstitutional and void as applied to plaintiffs' property.

■■ The instant case is strikingly similar in its procedural posture to the recent Illinois Supreme Court case of *Schultz v. Village of Lisle*, 53 Ill.2d 39, 42, 289 N.E.2d 614. There plaintiffs filed a declaratory judgment action praying that the Village's zoning ordinance be declared void and ineffective to prevent plaintiffs from developing their property for an automobile service station, after this relief was denied by the Village

Board. Between the zoning classification that applied to plaintiffs' property and the classification plaintiffs sought were several intervening classifications, as is also true of the instant case. In *Schultz* the witnesses for the Village admitted that the proper classification of the property was not for single-family residences, but that the property should retain a residential classification. So too in the instant case defendants in their brief admit that their "experts agree that the R-3 classification is too restrictive and are uniform in their opinions that R-4 single family residential would be the highest and best use of the property." The court in *Schultz* then went on to state the issue before it and the standard to be applied as:

> "In this case we need not reach the question of the validity of the zoning ordinance generally as it relates to plaintiffs' property. The declaratory relief sought is that the ordinance is void insofar as it prohibits the proposed use of the property for a gasoline service station. This court has held that it is appropriate to frame the decree with reference to the record before it, and the zoning ordinance may be set aside only to the extent necessary to permit the specific use proposed. [Citations.]
>
> Although the undisputed testimony may indicate that the proper classification of plaintiffs' property is either 'B' Residence or 'C' Residence rather than 'A' Residence, we need not decide whether the zoning ordinance as it relates to plaintiffs' property is for this reason invalid because none of these three classifications permit the use of property for a gasoline service station. *The question which was presented to the trial court and which is before this court is the reasonableness of permitting the requested use of plaintiffs' property. In testing the validity of the zoning ordinance in this case we are only concerned with the validity of the ordinance insofar as it prohibits this proposed use. The general rules, of course, apply, in that the person attacking the ordinance must prove by clear and convincing evidence that the zoning ordinance is, as to him, arbitrary and unreasonable and without substantial relation to public health, safety, morals, or welfare.* [Citations.]" (Emphasis supplied.)

In the instant case none of the intervening classifications permits the proposed use. Plaintiffs therefore have the same burden of overcoming the presumption of validity by clear and convincing evidence as did the plaintiffs in *Schultz*.

The general factors which a court looks to in determining the validity of a zoning ordinance have been stated time and again (see *La Salle National Bank v. County of Cook*, 12 Ill.2d 40, 145 N.E.2d 65; *Hoffman*

*v. City of Waukegan*, 51 Ill.App.2d 241, 201 N.E.2d 177) and we shall make reference to them in our discussion only as they relate to the record before us.

■■ The evidence stands undisputed that within at least a 1-mile arc from north of the subject property, east and then south, the surrounding lands are either being used for residential purposes or are vacant and that all of this land is within a single-family residential zoning classification. Of paramount importance in determining the validity or invalidity of the given classification is the question of whether it is in conformity with existing uses and the zoning classification of nearby property. (*Liberty National Bank v. City of Chicago*, 10 Ill.2d 137, 144, 139 N.E.2d 235.) There was much dispute among the expert witnesses as to whether the property received its character from these surrounding residential uses or from the commercial uses found west of the tollway. This question is not to be limited by the experts' opinions alone. (*Mangel & Co. v. Village of Wilmette*, 115 Ill.App.2d 383, 392-393, 253 N.E.2d 9.) The fact of newly constructed single-family residences in the Citation Lakes Estates development in addition to the large number of such dwelling units already in existence, some of which abut the subject property, reflect a trend of development conforming to the existing uses and thus are strong evidence in support of the suitability of the existing zoning and a determination of the character of the area. (*Gedmin v. City of Chicago*, 88 Ill.App.2d 294, 300, 232 N.E.2d 573.) In our opinion these contiguous and nearby uses are determinative of the character of the subject property rather than the use and zoning for commercial purposes west of the tollway. *Elmhurst National Bank v. City of Chicago*, 22 Ill.2d 396, 405, 176 N.E.2d 771.

There is present in the surrounding area some acreage of vacant land. If plaintiffs were allowed to build their proposed development, one can infer from the evidence that every vacant lot in the vicinity of the commercial development would become a potential threat to owners of the surrounding residential property. (*Elmhurst National Bank* at 406.) Plaintiffs' expert proposed that with the development both Bernstein's property and the land south of Willow Road should be rezoned. It has been stated, both by this court and the Illinois Supreme Court, "that the single-family residential character of property will not be upset because of some commercial use near or even adjoining such property." (*Jans v. City of Evanston*, 52 Ill.App.2d 61, 72, 201 N.E.2d 663.) Nor should this court upset the County's legislative determination of zoning this R-3 so that a future orderly residential development of this area would follow. *Camboni's, Inc. v. County of DuPage*, 26 Ill.2d 427, 187 N.E.2d 212.

■■ "The regulation of density, as related to land use, is a legitimate

object of police power." (*Exchange National Bank v. County of Cook,* 25 Ill.2d 434, 441, 185 N.E.2d 250.) Such regulations prevent congestion of population, secure quiet residence districts, expedite local transportation and facilitate the suppression of disorder, the extinguishment of fires and the enforcement of traffic and sanitary regulations, all of which have a direct bearing upon, and substantial relation to, the public health, safety, morals or general welfare of the community. (*Reskin v. City of Northlake,* 55 Ill.App.2d 184, 204 N.E.2d 600; *Wesemann v. Village of La Grange Park,* 407 Ill. 81, 94 N.E.2d 904.) It is undisputed that this development will bring into the area a large number of people. The testimony of the traffic experts varied, but defendants' expert stated that traffic congestion, at the very least, would be increased. Even Box, plaintiffs' rebuttal witness, stated there were insufficient gaps to accommodate the number of cars attempting to turn left out of the site during the evening rush hour. He also stated that a barrier median on Willow Road was needed to guarantee the proposed right turn only at the west exit, and no such plans exist to change the now-existing mountable median.

The homes located in this immediate area, even using plaintiffs' experts' values, are of substantial worth. The owners of these homes have every right to rely upon the rule of law that the existing zoning regulations will not be changed unless the change is required for the public good. Nor does the fact that some of these homes were built a number of years ago deprive these owners of their right to rely on the above rule. (*Kennedy v. City of Chicago,* 11 Ill.2d 302, 142 N.E.2d 697; *Urann v. Village of Hinsdale,* 30 Ill.2d 170, 195 N.E.2d 643.) Yet the testimony of the expert valuation witnesses suggests the possibility of some depreciation to nearby residential properties. Barancik testified that Drymalski's house would depreciate somewhat. Campbell testified there will be some minimal adverse effect on the homes to the north. Martin, defendants' expert, felt that a substantial depreciation totalling approximately one-half million dollars would be inflicted upon these homes. This possible depreciation would be the consequence of a development on which the experts disagreed as to the need, a consideration which may have motivated the legislative body to deny the proposed rezoning in the first instance. *Hoffmann v. City of Waukegan,* 51 Ill.App.2d 241, 201 N.E.2d 177.

■■ Plaintiffs have argued that the subject property's proximity to the tollway and the commercial uses to the west of the tollway, as well as its proximity to Willow Road, a conceded major traffic artery, makes the property unsuitable for residential development. It is undisputed that single-family houses can be physically built on the site. There is evidence that the residential pattern to the north could be extended

south into the subject site with homes erected so that they "back up" to Willow Road. In *Koplos v. City of Rockford*, 62 Ill.App.2d 268, 272-273, 210 N.E.2d 629, this same argument, that a nearby highway interchange makes the property unsuitable for single dwelling homes, was advanced and was answered by the court when it quoted from *La Salle National Bank v. Village of Western Springs*, 30 Ill.2d 340, 196 N.E.2d 680 (1964), stating:

> " 'Many homes have been constructed adjoining tollways in metropolitan Cook County, thereby indicating that adjacent tollways with their wide rights of ways do not preclude residential development.' "

Admittedly there is heavy traffic on Willow Road. This in itself does not impart a commercial character to the subject property (*Seith v. City of Wheaton*, 89 Ill.App.2d 446, 232 N.E.2d 173), and although it is a factor militating against residential use, it cannot be considered conclusive. (*Elmhurst National Bank v. City of Chicago*, 22 Ill.2d 396, 176 N.E.2d 771.) Nor can the commercial uses to the west of the tollway be such as to render the zoning classification arbitrary and unreasonable. It is fundamental that zoning must begin and end somewhere, and just because property is near a boundary line would not justify rezoning. Likewise it has been held that streets may form an appropriate boundary for zoning districts. *Bennett v. City of Chicago*, 24 Ill.2d 270, 181 N.E.2d 96.

■■■ Plaintiffs argue that their property would be worth more if zoned as prayed, and they are suffering a financial hardship due to the present zoning classification. They also place great emphasis on the fact that the subject property, excluding the single-family residence of the Ostroms, has been vacant for some length of time. It is uncontested that plaintiffs' property would be worth more if a less restrictive zoning classification were applied to it. This fact alone cannot be conclusive for it exists in nearly every case where the intensity with which property may be used is restricted by zoning classifications. (*Liberty National Bank v. City of Chicago*, 10 Ill.2d 137, 139 N.E.2d 235.) The length of time property lies vacant under a given zoning classification certainly is a factor to be considered (*Lakeland Bluff, Inc. v. County of Will*, 114 Ill. App.2d 267, 252 N.E.2d 765), but under the record before us where no evidence was presented on whether any attempts were made to sell this property for residential purposes, we find little merit to plaintiffs' argument. *La Salle National Bank v. City of Chicago*, 4 Ill.App.3d 266, 280 N.E.2d 739.

■■ Finally, plaintiffs contend that the recent case of *Hutson v. County of Cook*, 17 Ill.App.3d 195, controls the decision in the instant case. This case involved a tract of land located on Willow Road about

1 mile east of the property in the instant case. In *Hutson* the court affirmed the trial court in holding the zoning ordinance void and allowing plaintiffs to erect single-family residences within an R-4 zoning classification on part of the land, and to build a development including a food store, restaurant and local shops on the other part of their land. It needs no citation of authority to state the common rule that zoning cases must be decided on their own facts and circumstances. A court must make its decision on the basis of the record before it. Aside from this general rule, we believe that there are certain differences which distinguish the cases. In *Hutson* there was evidence that a commercial nursery was operating at the same intersection as the subject property. The height of the building in *Hutson* was to be three stories, whereas the motel in the instant cause would be six stories. Further, the R-4 single-family homes would act as a buffer to that development. Only the 5-foot-high bern was to be a buffer for the property involved in the instant case. We therefore conclude that this case cannot be deemed controlling of our instant decision.

■■ We have carefully reviewed the record in the instant case and find that at best there is created a legitimate difference of opinion on the reasonableness of prohibiting the proposed use. Under such circumstances the presumption of validity has not been overcome. (*Avenue State Bank v. Village of Oak Park*, 99 Ill.App.2d 329, 241 N.E.2d 630.) In view of this finding we need not consider defendants' other contention. Shaping the order of the court to the facts of the particular case (*Schultz v. Village of Lisle*, 53 Ill.2d 39, 289 N.E.2d 614; *Sinclair Pipe Line Co. v. Village of Richton Park*, 19 Ill.2d 370, 167 N.E.2d 406), we hold that prohibiting plaintiffs' proposed development is reasonably related to the public health, safety, morals and welfare of the community. The judgment is reversed.

Reversed.

SULLIVAN, P. J., and LORENZ, J., concur.